UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Ismael Munoz and Cynthia Munoz,<br><br>Plaintiffs,<br><br>v.<br><br>Tony Bradbury et al.,<br><br>Defendants. | Case No. 3:21-cv-50231<br><br>Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Ismael and Cynthia Munoz (the Munozes) bring this action under 42 U.S.C. § 1983 alleging violations of their rights under the Fourteenth Amendment. Before the Court are two motions for summary judgment: one by Carissa Morrissey, an employee of Illinois' Department of Children and Family Services (DCFS); the other by police officers Tony Bradbury and Jacob Maratos and building inspectors Doug Quinn and Ben Fritz, all employees of the City of Freeport. For the following reasons, both motions are granted, and this case is dismissed.

**I. Background**

The Munozes lived with their several minor children in Freeport, Illinois. Dkt. 84 ¶ 1. On June 11, 2020, one of their children—then 17 years old—shot and killed someone with whom he was "feud[ing]" on the front porch of their house while many of the other, younger children were home. *Id.* ¶¶ 6, 12-13. Cynthia Munoz returned home when she learned of the shooting and allowed Detective Tony

1

Bradbury and other police officers to do a protective sweep of the house but did not allow a search; the police thus obtained a search warrant and returned to search the house. Dkt. 73 ¶¶ 14-17.

On the morning of June 15, Bradbury left a voicemail with Cynthia Munoz telling her that he wanted to interview the other children, to which she didn't respond; a little over an hour later, Detective Jacob Maratos made a report to the DCFS child abuse hotline. Dkt. 84 ¶¶ 3-4. He reported the shooting as well as the "atrocious living conditions" the police had seen while executing the search warrant—undisputed aspects of which include that there were six inches of water in the basement, with some sort of sludge resting on top; that between fifty and one-hundred garbage bags sat outside; that the garage was falling in on itself; that there was an extremely foul order that he suspected was evidence of mold; and that various areas of the house were missing walls or floor boards. *Id.* ¶ 8. DCFS immediately began an investigation and assigned the case to Carissa Morrissey. *Id.* ¶¶ 9-11. She spoke with Maratos and he recited to her what he had told the hotline. *See id.* ¶¶ 13-15.

In the afternoon of June 15, Morrissey went to the Munozes' house and met with Ismael Munoz; she told him, without looking inside, that the Munozes would need to agree to have their children stay elsewhere (an out-of-home "safety plan") because of the house's condition, or she would take protective custody of them. *Id.* ¶¶ 20-21; Dkt. 96 ¶¶ 20-21. The Munozes agreed and arranged for the children to be placed with family friends. Dkt. 84 ¶ 22. A written safety plan, which provided that

2

the children would remain outside of the house until it was cleaned and had undergone certain repairs, and that the parents could only have supervised contact with the children, was signed by the Munozes. *Id.* ¶ 30-32. While the safety plan was in effect, the children were interviewed by DCFS. *Id.* ¶ 35-38.

On June 16, Morrissey spoke with Freeport City Inspector Ben Fritz, and told him of the house's "deplorable" condition. *Id.* ¶ 33. On June 17, the house was inspected by Fritz and Code Enforcement Supervisor Doug Quinn; they condemned it after their inspection for "electrical and sanitary concerns." Dkt. 73 ¶ 22. On June 18, Morrissey met with the Munozes at their temporary residence and told them that the safety plan was terminated and the children could return to their care. Dkt. 84 ¶ 45. DCFS continued to investigate and eventually indicated findings of child abuse against the Munozes. *Id.* ¶¶ 46-47. The Stephenson County State's Attorney filed petitions for adjudication of wardship and for orders of protection; on July 7, 2020, the circuit court entered an order declaring a one-year supervisory wardship over the children because the Munozes had stipulated to the facts supporting the petition. *See id.* ¶¶ 48-51.

## II. Legal standard

### A. Summary judgment

A party is entitled to summary judgment when it demonstrates that there is no genuine dispute as to any material fact and judgment is proper as a matter of law. Fed R. Civ. P. 56. A fact is material when it could affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986),

and a dispute is genuine when it could lead a reasonable jury to return a verdict in favor of the non-moving party. *Id.* The Court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences—and only reasonable inferences, *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins.*, 994 F.3d 869, 876 (7th Cir. 2021)—in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Smith v. Crounse Corp.*, 72 F.4th 799, 804 (7th Cir. 2023).

"It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Packer v. Trustees of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 849 (7th Cir. 2015). "A district court may reasonably expect a party opposing summary judgment to lay out its case thoroughly and include in its memorandum cites to the specific parts of the record confirming that there are genuine disputes of material fact which require the case to be tried." *Id.* at 853. Any arguments not made or so supported are forfeited. *See id.* at 849.

**B. Local Rule 56.1**

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires a party seeking summary judgment to file an accompanying statement of facts, with numbered paragraphs and citations to the record supporting those facts. *See* LR 56.1(d). The opposing party must admit or controvert each fact in response; its response "may not set forth any new facts, meaning facts that are not fairly

responsive to the asserted fact to which the response is made." LR 56.1(e)(2). The response also "may not assert legal arguments except to make an objection." *Id.*

"District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). Similarly, facts not included in the statement of facts may be ignored. *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 810 (7th Cir. 2005). The requirements of Local Rule 56.1 apply equally to *pro se* plaintiffs. *See Greer v. Bd. of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

### III. Analysis

The Munozes failed to comply with Local Rule 56.1 in introducing new facts; because they did not submit their own statement of material facts, the Court confines its analysis to the defendants' statements of fact, except insofar as they are properly controverted by the Munozes with citations to the record.[1]

**A. Section 1983**

42 U.S.C. § 1983 provides a claim against any person who, under color of a state's "statute, ordinance, regulation, custom, or usage" deprives any person of a

---

[1] During a prefiling summary judgment conference held on December 30, 2022, Local Rule 56.1 was "explained in detail" to the Munozes. Dkt. 69. Both Morrissey and the Freeport defendants certify that they provided the required Local Rule 56.2 notice to the Munozes as well. Dkts. 78, 85.

5

right secured by the federal Constitution. 42 U.S.C. § 1983. Liability must be based on each defendant's knowledge and actions, *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012); *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009), which may include either direct participation in the "offending act," acting or failing to act with reckless disregard of someone's constitutional rights when under a duty to safeguard them, or allowing an offending act to occur with one's knowledge or consent. *Childress v. Walker*, 787 F.3d 433, 439-40 (7th Cir. 2015).

Under the doctrine of qualified immunity, when an official's conduct does not violate clearly established rights of which a reasonable person would have been aware, that official is immune from suit. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court may conclude that qualified immunity applies without reaching the underlying question of whether a right was violated if that right was not clearly established at the time of its alleged violation. *Id.* at 242. A right is clearly established if it would have been clear to a "reasonable officer" that his conduct was unlawful "in the situation he confronted." *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). This requires that "existing precedent" place the constitutional question "beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011).

**B. The claim against Morrissey cannot proceed because she is entitled to qualified immunity**

The Munozes assert that Morrissey violated their due process rights[2] because she failed to inspect the home for herself and should have known that the reports

---

[2] The Munozes make passing reference to the Fourth Amendment. The Court will not address any Fourth Amendment claim because it is insufficiently developed, and thus forfeited. *See Packer*, 800 F.3d at 849.

6

she received did not "correct[ly]" reflect the dangers faced by the children before she told the Munozes that the children would be removed unless they agreed to a safety plan, and because she obtained their agreement to the safety plan by coercion. Dkt. 98 ¶ 19. These essentially resolve into the same complaint: that at the time she threatened removal of their children, she did not know as much as the Constitution required before such a threat is licit. On the record before the Court, however, this claim cannot proceed, for Morrissey is at least entitled to qualified immunity.

A substantive due process claim arises when a "fundamental right or liberty" was infringed under color of state law in a fashion so "arbitrary and irrational" as to "shock the conscience." *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021) (cleaned up). There is a long-recognized fundamental right to freedom from "undue interference with family relations" balanced against the state's interest in protecting children from harm; this requires that a child protective service worker justify any infringing action—including merely initiating an investigation—by an objective showing of "some definite and articulable evidence giving rise to a reasonable suspicion that the child has been abused or is in imminent danger of abuse." *Sebesta v. Davis*, 878 F.3d 226, 232 (7th Cir. 2017).

Procedural due process protections are engaged only by "deprivations ordered over objection," not steps—like safety plans—"authorized by consent." *Id.* at 761–62. A safety plan is a form of "interim settlement agreement" that imposes "no obligation on anybody." *Id.* at 761. Although a safety plan procured voluntarily does not implicate due process, obtaining consent to it through duress—that is, issuing

7

an ultimatum without the legal right to effect a removal—can unconstitutionally infringe familial rights. *Jerger v. Blaize*, 41 F.4th 910, 915 (7th Cir. 2022).

No procedural due process claim can lie because there was no deprivation effected without consent, but a claim of an infringement of family relations could if Morrissey's threat was arbitrary and irrational—that is, if she had no legal right to make it because she did not have definite and articulable evidence giving rise to a reasonable suspicion that the children were in imminent danger of abuse.[3] Her belief that the children were endangered, however, was certainly not groundless. Maratos had reported the shooting and recounted in detail the "atrocious living conditions" at the house to the DCFS hotline. Dkt. 84 ¶ 8. Morrissey later spoke with Maratos, and he reiterated his concerns. *Id.* ¶¶ 13-15. The Munozes cite nothing to suggest that she ought to have been suspicious of his account, and nothing to show that her reasonable suspicion ought to have dissipated while the safety plan was in place.

Regardless of whether Morrissey knew enough to justify her actions—and she almost certainly did—she is entitled to qualified immunity. The Munozes bear the burden of showing that she is *not* immune from suit because she violated a clearly established constitutional right, *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Meaning, it must have been clear to her that her actions were unlawful in

---

[3] Under Illinois law, if there is (1) "reason to believe that the child cannot be cared for at home . . . without endangering the child's health or safety; and (2) there is not time to apply for a court order . . . for temporary custody of the child," the state can take the child into "temporary protective custody" with a post-deprivation hearing to be held within 48 hours, 325 ILCS 5/5, without offending the requirements of due process. *Dupuy v. Samuels*, 465 F.3d 757, 760 (7th Cir. 2006).

8

the concrete situation with which she was confronted, *Ziglar*, 582 U.S. at 151—namely, that she did not possess the requisite reasonable suspicion to investigate or threaten to enforce what she took to be the state's right to remove the children without further investigation. *See Dupuy*, 465 F.3d at 762. Because they offer nothing—let alone cases "on point or closely analogous," *Sebesta*, 878 F.3d at 234—Morrissey is entitled to qualified immunity.

One last issue: the Munozes assert that Morrissey told them that the house had been condemned in explaining why an out-of-house safety plan was required, which was not true. Dkt. 96 ¶ 21. Due process requires "at a minimum" that government officials cannot intentionally "misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir. 2000); *see also Xiong v. Wagner*, 700 F.3d 282, 292 (7th Cir. 2012). In the first place, however, there is no evidence that this was an intentional misrepresentation; according to the Munozes, Morrissey said that the Freeport Police Department had told her about the condemnation. Dkt. 96 ¶ 21. Even if it were a misrepresentation, the Seventh Circuit has suggested that this language is only applicable to the analysis of procedural due process claims, as opposed to the substantive due process claim raised here, because it is irrelevant to the objective inquiry into the existence of reasonable suspicion. *Xiong*, 700 F.3d at 292. Thus, she remains entitled to qualified immunity.

### C. The claims against Maratos and Bradbury cannot proceed because they are entitled to qualified immunity

The Munozes argue that by waiting four days to call the DCFS hotline—in spite of their duty under state law to report suspected violations immediately—and by relaying "false information," Maratos and Bradbury participated in the violation of their familial rights. As a preliminary matter, it is dubious that they have established Bradbury's role beyond speculation. *See* Dkt. 94 *passim*. Even if Bradbury were involved to the same extent as Maratos, however, he is equally entitled to qualified immunity, so the point is moot.

As to their contention that Maratos offered false information to DCFS, the only issue which approaches a proper dispute is whether the upstairs toilet was functioning and filled with water; the picture the Munozes cite to show that it was, contrary to Maratos' report, is too blurry to conclude either way. Dkt. 99 Ex. F. Even if it were clear, there is nothing else to suggest it is reasonable to infer that Maratos intentionally misrepresented this to DCFS—he supplied ample evidence, undisputed by the Munozes, to be confident that DCFS would find removal necessary without embellishing his report. And to the extent that it could be described as a misrepresentation, it fails for the same reason as the allegation against Morrissey, as does any allegation that he misrepresented whether the house had already been condemned. All other purported disputes are either improperly supported, immaterial, or both.[4]

---

[4] For instance, the Munozes contend that the pictures don't accurately represent the house as it was before the search warrant was executed. Dkt. 93 at ¶¶ 28-29. This vague assertion, is, in the first place, not enough to create a genuine dispute of material fact. *See*

10

Their second argument—that Maratos violated state law because he did not immediately report his concerns to DCFS, and only did so to secure interviews with the children—fails to state a violation of clearly established law. A violation of state law does not "clearly establish a violation of a constitutional right as required for a § 1983 action." *Stevens v. Umsted*, 131 F.3d 697, 707 (7th Cir. 1997); *Sebesta v. Davis*, 878 F.3d 226, 235 (7th Cir. 2017). And insofar as the "definite and articulable evidence" inquiry incorporates the principles of probable cause, the ulterior motives of the police are irrelevant—if the facts known to them objectively met the relevant standard, the inquiry ceases. *Whren v. United States*, 517 U.S. 806, 812 (1996). The Court need not determine that he actually met the standard, however, because the Munozes have failed to produce a case showing that his conduct violated a clearly established right. Thus, he—and Bradbury, to the extent he could be said to have participated in Maratos' actions—are entitled to qualified immunity.

### D. The claims against Quinn and Fritz cannot proceed because they are at least entitled to qualified immunity

Finally, the Munozes argue that Quinn and Fritz violated their procedural due process rights because they prejudged the merits of the inspection, having already decided that the house would be condemned before seeing it, and misrepresented their findings to support condemnation. Dkt. 94 ¶ 53. They cite no

---

*Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018). Even if the premise that the house was in better shape before the police entered were accepted, the execution of a search warrant would inevitably require disturbing the house to some degree. The Munozes raise no Fourth Amendment claim regarding the unreasonableness of the search. It simply strains credulity to draw the inference that the police created as much disarray as is evident unless the house were already in deep disrepair; such an inference is "blatantly contradicted" by the photographs in the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

11

evidence consistent with Local Rule 56.1 to support these claims, or any cases clearly establishing a relevant right, so they fail. *See* Dkts. 93, 94.

## IV. Conclusion

For the foregoing reasons, the motions for summary judgment are granted, and this action is terminated.

Date: January 12, 2024

_____
Honorable Iain D. Johnston
United States District Judge